# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| *versus* | : CRIMINAL NO. 19-120-BAJ-EWD |
| MARK THOMAS ALLEN | : |

## PLEA AGREEMENT

The United States Attorney's Office for the Middle District of Louisiana, the United States Department of Justice, Criminal Division, Fraud Section ("the United States") and Mark Thomas Allen ("the defendant") hereby enter into the following plea agreement pursuant to Fed. R. Crim. P. 11(c).

### A. THE DEFENDANT'S OBLIGATIONS

#### 1. Guilty Plea

The defendant agrees to enter a plea of guilty to Count 1 of an Indictment filed in the Middle District of Louisiana, Docket Number 19-cr-120-BAJ-EWD, charging him with Conspiracy to Commit Health Care Fraud in violation of 18 U.S.C. § 1349.

#### 2. Financial Information

The defendant agrees to fully and truthfully complete the financial statement provided to him by the United States and to return the financial statement to the United States within ten days of this agreement being filed with the Court. Further, the defendant agrees to provide the United States with any information or documentation in his possession regarding his financial affairs and to submit to a debtor's examination upon request. Any financial

information provided by the defendant may be used by the United States to collect any financial obligations imposed in this prosecution and may be considered by the Court in imposing sentence.

**B.    UNITED STATES' OBLIGATIONS**

    **1.    Non-prosecution/Dismissal of Charges**

The United States agrees that, if the Court accepts the defendant's guilty plea, it will move to dismiss the remaining counts of the Indictment after sentencing, and it will not prosecute the defendant for any offense related to the offenses charged in the Indictment.

    **2.    Motion for Third Point for Acceptance of Responsibility**

The United States acknowledges that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently. The United States therefore agrees that, if the Court finds that the defendant qualifies for a two-level decrease in offense level for acceptance of responsibility under USSG § 3E1.1(a) and, prior to the operation of USSG § 3E1.1(a), the defendant's offense level is 16 or greater, the United States will move the Court pursuant to USSG § 3E1.1(b) to decrease the defendant's offense level by one additional level. The United States reserves the right to object to a decrease in offense level for acceptance of responsibility based on information received by the United States after the effective date of this agreement, including information that the defendant failed to timely submit the financial statement required by Section A(2) of this agreement.

## C.    SENTENCING

### 1.    Maximum Statutory Penalties

The maximum possible penalty on Count 1, Conspiracy to Commit Health Care Fraud, is a term of imprisonment of ten years, a fine of up to $250,000 or twice the gross gain or twice the gross loss, whichever is greater, and a term of supervised release of three years.

In addition to the above, the Court must impose a special assessment of $100 per count which is due at the time of sentencing. The Court may also order restitution.

### 2.    Supervised Release

Supervised release is a period following release from imprisonment during which the defendant's conduct is monitored by the Court and the United States Probation Office and during which the defendant must comply with certain conditions. Supervised release is imposed in addition to a sentence of imprisonment, and a violation of the conditions of supervised release can subject the defendant to imprisonment over and above any period of imprisonment initially ordered by the Court for a term of up to two years, without credit for any time already served on the term of supervised release.

### 3.    Sentencing Guidelines

The Court will determine in its sole discretion what the defendant's sentence will be. While the Court must consider the United States Sentencing Guidelines in imposing sentence, the Sentencing Guidelines are not binding on the Court. The Court could impose any sentence up to the maximum possible penalty as set out above despite any lesser or greater sentencing range provided for by the Sentencing Guidelines.

4. **No Agreement Regarding Sentencing**

Except as set forth in this agreement and the supplement to the plea agreement, the United States makes no promises, representations, or agreements regarding sentencing. In particular, the United States reserves the right to present any evidence and information, and to make any argument, to the Court and the United States Probation Office regarding sentencing.

5. **Forfeiture and Restitution**

The United States and the defendant agree that, upon confirmation by the United States that defendant has made payment to the United States pursuant to the False Claims Act settlement agreement executed contemporaneously with this plea agreement, the United States will not seek a forfeiture money judgment against defendant in this case. Furthermore, the total amount of restitution owed by the defendant under a restitution order entered by the Court shall not include such amounts as are credited pursuant to 18 U.S.C. 3664(j)(2).

D. **FACTUAL BASIS**

The United States and the defendant stipulate to the following facts:

### The Medicare Program

The Medicare Program ("Medicare") was a federally funded program, affecting commerce, that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare. Individuals who received benefits under Medicare were referred to as "beneficiaries."

Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part B" covered, among other things, medical services provided by physicians, clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or

"Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, rather than through Medicare Part B.

Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided services to beneficiaries were able to apply for and obtain a Medicare provider number. Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services rendered to beneficiaries that were medically necessary. Medicare prohibited the submission of claims that were procured through the payment of kickbacks and bribes.

### **Cancer Genetic Testing**

Cancer genetic testing ("CGx testing") used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual had cancer at the time of the test. Medicare did not cover diagnostic testing, including CGx testing, that was not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Specifically, all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests, including CGx tests, were required to be ordered by the physician who was treating the beneficiary, that is, the physician who furnished a consultation or treated a beneficiary for a specific medical problem and who used the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who was treating the beneficiary were not reasonable and necessary.

### **Telemedicine**

Telemedicine provided a means of connecting patients to doctors and other providers by using telecommunications technology, such as the internet or telephone. Telehealth services, such as consultations, could be covered by and reimbursable under Medicare, but only if certain requirements were met, including that the telehealth services were ordered by a licensed provider and were reasonable and medically necessary to diagnose and treat a covered illness or condition. Legitimate telemedicine companies employed licensed providers to furnish telehealth services, including consultations, to beneficiaries. These telemedicine companies typically, in turn, submitted claims to Medicare for the telehealth services provided by employees to beneficiaries.

## The Defendant and Relevant Entities

Archer Diagnostics, LLC ("Archer"), a South Carolina limited liability company with its principal place of business in Greer, South Carolina, was a purported marketing company that referred tests to diagnostic laboratories. Defendant Mark Thomas Allen ("Allen") was a resident of South Carolina. Allen owned and operated Archer.

Company 1, a Florida limited liability company with its principal place of business in Tampa, Florida, was a purported marketing company that identified and arranged for beneficiaries to receive CGx testing. Company 2, a Florida limited liability company with its principal place of business in Tampa, Florida, was a purported telemedicine company that arranged with telemedicine providers to provide telehealth services. Co-Conspirator 1 owned and operated Company 1 and Company 2.

Acadian Diagnostic Laboratories, LLC ("Acadian"), a Louisiana limited liability company with its principal place of business in Baton Rouge, Louisiana, was a laboratory that purported to provide diagnostic testing services, including CGx testing. Kevin Bernard Hanley ("Hanley"), a resident of Prairieville, Louisiana, was the Chief Financial Officer of Acadian.

Lazarus Services, LLC ("Lazarus"), a Delaware limited liability company with its principal place of business in New Orleans, Louisiana; Performance Laboratories, LLC ("Performance"), an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma; and Clio Laboratories, LLC ("Clio"), a Georgia limited liability company with its principal place of business in Lawrenceville, Georgia, were laboratories that purported to provide diagnostic testing services, including CGx testing. Khalid Ahmed Satary ("Satary"), a resident of Lawrenceville, Georgia, owned and operated Lazarus, Performance, and Clio (collectively, the "Satary Labs").

Specialty Drug Testing LLC ("Specialty"), a Louisiana limited liability company with its principal place of business in Monroe, Louisiana, was a laboratory that purported to provide diagnostic testing services, including CGx testing.

## Conspiracy to Commit Health Care Fraud

Beginning in or around January 2018, and continuing through in or around July 2019, the defendant, Allen, did knowingly and willfully conspire with Co-Conspirator 1, Satary, and others to execute a scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicare and Medicare Advantage Plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services.

Specifically, Allen's co-conspirators, including Co-Conspirator 1, purchased "leads" from third-party call centers. These "leads" consisted of information about Medicare beneficiaries who expressed an interest in CGx testing after responding to telemarketing campaigns, internet solicitations, and other forms of direct-to-patient marketing conducted by the call centers. These call centers, as Allen knew, did not employ medical professionals.

Allen's co-conspirators, including Co-Conspirator 1, directed that DNA swab kits and "requisitions" be shipped to the beneficiaries identified by the call centers. Requisitions were pre-printed forms specifying the available types of CGx tests and identifying the laboratory that would perform the test. Beneficiaries were asked to sign the requisition forms to indicate their consent to having a CGx test performed, and to return the swabs and requisition forms to Company 1.

Once the completed swabs and requisitions were received, Allen and his co-conspirators, through Company 1, Company 2, and others, obtained false and fraudulent doctors' orders for the CGx testing by paying telemedicine providers to electronically sign off on the tests. These payments were made even though Allen knew that the licensed providers were not treating the beneficiaries for cancer or symptoms of cancer, often did not speak with or evaluate the beneficiaries for whom testing was ordered, and did not use the test results in any treatment of the beneficiaries. The telemedicine providers did not submit claims to Medicare for telehealth services purportedly provided to beneficiaries and did not collect payment for the services from Medicare beneficiaries.

As a marketer, Allen arranged for the CGx tests to be conducted by Acadian, the Satary Labs, and Specialty in exchange for kickbacks paid out of reimbursements made to the laboratories by Medicare and Medicare Advantage Plans. The DNA swabs and doctors' orders were sold by Allen to these laboratories in exchange for kickbacks paid by Hanley and Satary, knowing that the laboratories would submit false and fraudulent claims to Medicare and Medicare Advantage Plans for CGx testing that was not medically necessary and, therefore, not eligible for reimbursement. Allen paid a portion of these kickback payments from the laboratories to Co-Conspirator 1, who, in turn, and as Allen knew, used the money to compensate the telemedicine providers and call centers.

Between January 2018 and July 2019, Acadian, the Satary Labs, and Specialty collectively submitted at least $132 million in claims to Medicare and Medicare Advantage Plans based upon DNA samples obtained through Allen and his co-conspirators, for CGx testing that was not ordered by a treating physician, was not medically necessary, and was not appropriately reimbursable by Medicare. Based on these claims, Acadian, the Satary Labs, and Specialty collectively were reimbursed at least $26.2 million.

The defendant admits that, to the best of his knowledge and belief, the stipulated statement of facts is true and correct in all respects. The United States and the defendant agree

that, had this matter gone to trial, the United States could have proved such facts. The United States and the defendant further agree that such facts are sufficient to support conviction of the offense to which the defendant has agreed to plead guilty. The defendant understands that, by the terms of USSG § 6B1.4, the Court is not limited by the stipulated facts for purposes of sentencing. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation and any other relevant information.

The defendant agrees that, effective as of the date the defendant signs this plea agreement, and notwithstanding any other subsequent event, including but not limited to the defendant's failure to plead guilty, the court's refusal to accept the defendant's guilty plea, or the defendant's withdrawal (or attempted withdrawal) of his guilty plea, the factual basis set forth in this plea agreement shall be admissible against the defendant in any criminal case involving the United States and the defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, the defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Fed. R. Evid. 410), the Federal Rules of Criminal Procedure (including Fed. R. Crim. P. 11), or the United States Sentencing Guidelines (including USSG § 1B1.1(a)) that the factual basis set forth in this plea agreement should be suppressed or is otherwise inadmissible as evidence (in any form).

## E. BREACH AND ITS CONSEQUENCES

### 1. Conduct Constituting Breach

Any of the following actions by the defendant constitutes a material breach of this agreement:

    a. failing to plead guilty to Count 1 of the Indictment at re-arraignment;

    b. representing, directly or through counsel, to the United States or the Court that he will not plead guilty to Count 1 of the Indictment;

    c. moving to withdraw his guilty plea;

    d. filing an appeal or instituting other post-conviction proceedings not authorized in Section F(2);

    e. disputing or denying guilt of the offense to which the defendant has agreed to plead guilty or denying or disputing any fact contained in the stipulated factual basis;

    f. concealing or disposing of assets with the specific intent of shielding such assets from forfeiture;

    g. providing false, misleading, or incomplete information or testimony, including financial information and testimony provided pursuant to Section A(2), to the United States; or

    h. violating the terms of this agreement or the supplement to the plea agreement in any other manner.

### 2. Consequences of Breach

In the event of a breach by the defendant, the United States is relieved of its obligations under the agreement and the supplement to the plea agreement. In particular, the United States may prosecute the defendant for any criminal offense. In addition, any statements and information provided by the defendant pursuant to this agreement (or the supplement to the

plea agreement) or otherwise, and any information and evidence derived therefrom, may be used against the defendant in this or any other prosecution or proceeding without limitation. Such statements and information include, but are not limited to, the plea agreement itself (including the factual basis contained in Section D), the supplement to the plea agreement, statements made to law enforcement agents or prosecutors, testimony before a grand jury or other tribunal, statements made pursuant to a proffer agreement, statements made in the course of any proceedings under Rule 11, Fed. R. Crim. P. (including the defendant's entry of the guilty plea), and statements made in the course of plea discussions. The defendant expressly and voluntarily waives the protection afforded by Fed. R. Evid. 410 as to any statements made by him personally (but not as to statements made by his counsel). The defendant is not entitled to withdraw his guilty plea.

3. **Procedure for Establishing Breach**

The United States will provide written notice to the defendant or his attorney if it intends to be relieved of its obligations under the agreement and the supplement to the plea agreement as a result of a breach by the defendant. After providing such notice, the United States may institute or proceed with any charges against the defendant prior to any judicial determination regarding breach. However, the United States will obtain a judicial determination regarding breach prior to using statements and information provided by the defendant or any act of producing documents or items by the defendant pursuant to this agreement or the supplement to the plea agreement, or any evidence or information derived therefrom, in its case-in-chief in a criminal trial or in sentencing the defendant in this case. The standard of proof in any proceeding to determine whether the plea agreement or the

supplement to the plea agreement has been breached is preponderance of the evidence. To prove a breach, the United States may use (1) any and all statements of the defendant, (2) any and all statements of his counsel to the Court (including the United States Probation Office), and (3) any representation by defense counsel to the United States that the defendant will not plead guilty.

### F.   **WAIVERS BY THE DEFENDANT**

#### 1.   **Waiver of Trial Rights**

By pleading guilty, the defendant waives the right to plead not guilty or to persist in a not guilty plea and waives the right to a jury trial. At a trial, the defendant would have the trial rights to be represented by counsel (and if necessary have the Court appoint counsel), to confront and examine adverse witnesses, to be protected against compelled self-incrimination, to testify and present evidence, to compel the attendance of witnesses, and to have the jury instructed that the defendant is presumed innocent and the burden is on the United States to prove the defendant's guilt beyond a reasonable doubt. By waiving his right to a trial and pleading guilty, the defendant is waiving these trial rights.

#### 2.   **Waiver of Appeal and Collateral Remedies**

Except as otherwise provided in this section, the defendant hereby expressly waives the right to appeal his conviction and sentence, including any appeal right conferred by 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and to challenge the conviction and sentence in any post-conviction proceeding, including a proceeding under 28 U.S.C. § 2241, 28 U.S.C. § 2255, or 18 U.S.C. § 3582(c)(2). This waiver applies to any challenge on appeal or in any post-conviction proceeding to any aspect of the defendant's sentence, including imprisonment, fine,

special assessment, restitution, forfeiture or the length and conditions of supervised release or probation. The defendant, however, reserves the right to appeal the following: (a) any sentence which is in excess of the statutory maximum; (b) any sentence which is an upward departure pursuant to the Sentencing Guidelines; and (c) any non-Guidelines sentence or "variance" which is above the guidelines range calculated by the Court. Notwithstanding this waiver of appeal and collateral remedies, the defendant may bring any claim of ineffectiveness of counsel.

**3.     Waiver of Statute of Limitations**

The defendant hereby waives all defenses based on the applicable statutes of limitation as to the offense charged in the Indictment including those that the United States has agreed to dismiss in Section B(1) and all offenses that the United States has agreed not to prosecute, as long as such offenses are not time-barred on the effective date of this agreement. The defendant likewise waives any common law, equitable, or constitutional claim of pre-indictment delay as to such offenses, as long as such offenses are not time-barred on the effective date of this agreement. The waivers contained in this paragraph will expire one year after the date of any of the following: (1) a judicial finding that defendant has breached the plea agreement; (2) the withdrawal of any plea entered pursuant to this plea agreement; or (3) the vacating of any conviction resulting from a guilty plea pursuant to this plea agreement.

**4.     Waiver of Speedy Trial Rights**

The defendant hereby waives any common law, equitable, or constitutional claim regarding post-indictment delay as to the offense charged in the Indictment including those that the United States has agreed to dismiss in Section B(1). The waiver contained in this

paragraph will expire one year after the date of any of the following: (1) a judicial finding that defendant has breached the plea agreement; (2) the withdrawal of any plea entered pursuant to this plea agreement; or (3) the vacating of any conviction resulting from a guilty plea pursuant to this plea agreement.

## G. **EFFECT OF AGREEMENT**

### 1. **Effective Date**

This agreement and the supplement to the plea agreement are not binding on any party until both are signed by the defendant, defendant's counsel, and an attorney for the United States. Once signed by the defendant, his counsel, and an attorney for the United States, the agreement and the supplement are binding on the defendant and the United States.

### 2. **Effect on Other Agreements**

This agreement incorporates the supplement to the plea agreement which will be filed under seal with the Court. In this district, the Court requires that a sealed supplement be filed with every plea agreement regardless of whether the defendant is cooperating. The supplement either states that the defendant is not cooperating or provides the terms of the defendant's agreement to cooperate. This plea agreement, along with the aforementioned supplement to the plea agreement, supersedes any prior agreements, promises, or understandings between the parties, written or oral, including any proffer agreement.

### 3. **Effect on Other Authorities**

The agreement does not bind any federal, state, or local prosecuting authority other than the United States Attorney's Office for the Middle District of Louisiana or the United States Department of Justice, Criminal Division, Fraud Section.

### 4. Effect of Rejection by Court

Pursuant to Fed. R. Crim. P. 11, the Court may accept or reject this plea agreement and the supplement to the plea agreement. If the Court rejects the plea agreement and the supplement, the plea agreement and the supplement are no longer binding on the parties and are not binding on the Court. If the Court rejects the plea agreement and the supplement, the defendant will be given the opportunity to withdraw his plea and such withdrawal will not constitute a breach of the agreement. If the defendant does not withdraw his plea following rejection of the plea agreement and the supplement, the disposition of the case may be less favorable to the defendant than contemplated by the plea agreement.

## H. REPRESENTATIONS AND SIGNATURES

### 1. By The Defendant

I, Mark Thomas Allen, have read this plea agreement and have discussed it with my attorney. I fully understand the agreement and enter into it knowingly, voluntarily, and without reservation. I have not been threatened, intimidated, pressured, or coerced in any manner. I am not under the influence of any substance or circumstance that could impede my ability to understand the agreement and its consequences.

I affirm that absolutely no promises, agreements, understandings, or conditions have been made, agreed to, or imposed by the United States in connection with my decision to plead guilty except those set forth in this agreement and the supplement to the plea agreement.

I acknowledge that no promises or assurances have been made to me by anyone as to what my sentence will be. I understand that representations by my attorney (or anyone else)

regarding application of the Sentencing Guidelines and/or my possible sentence are merely estimates and are not binding on the Court.

I have read the Indictment and discussed it with my attorney. I fully understand the nature of the charge, including the elements.

I have accepted this plea agreement and agreed to plead guilty because I am in fact guilty of the offense charged in Count 1 of the Indictment.

I am satisfied with the legal services provided by my attorney and have no objection to the legal representation I have received.

_____    DATE: 11-15-21
Mark Thomas Allen
Defendant

2. **By Defense Counsel**

I have read the Indictment and this plea agreement and have discussed both with my client, Mark Thomas Allen, who is the defendant in this matter. I am satisfied that the defendant understands the agreement and the charge against him, including the elements. I am also satisfied that the defendant is entering into the agreement knowingly and voluntarily. This agreement, together with the supplement to the plea agreement, accurately and completely sets forth the entire agreement between the defendant and the United States.

_____    DATE: 11/15/21
Beattie B. Ashmore
Counsel for Defendant

_____    DATE: 11-15-21
James W. Fayssoux Jr.
Counsel for Defendant

_____        DATE: 11/15/21
C. Frank Holthaus
Counsel for Defendant

**3.     By the United States**

We accept and agree to this plea agreement on behalf of the United States. This agreement, together with the supplement to the plea agreement, accurately and completely sets forth the entire agreement between the defendant and the United States.

_____        DATE: 11/10/2021
Ellison C. Travis
Acting United States Attorney
Middle District of Louisiana

_____        DATE: 11/15/2021
Kristen L. Craig
Assistant United States Attorney
Middle District of Louisiana

_____        DATE: 11/15/2021
Gary A. Winters
Justin M. Woodard
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice